IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| CURTIS HUNTER,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>LIEUTENANT MORRIS, *et al.*,<br><br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) CIVIL ACTION NO. 5:19:cv-00491 (MTT)<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER**

Plaintiff Curtis Hunter filed this 42 U.S.C. § 1983 action against Defendants The GEO Group, Inc. ("GEO"), Health Services Administrator Tammy Bailey, and Lieutenant Marcus Morris asserting violations of his Eighth and Fourteenth Amendment rights stemming from his incarceration at Riverbend Correction Facility ("Riverbend").[1]  Doc. 30.  Defendants GEO, Bailey, and Lieutenant Morris moved for summary judgment on all claims.  Doc. 83.  For the reasons discussed below, Defendants' motion is **GRANTED**.

---

[1] The Fourteenth Amendment is implicated only to the extent that the Eighth Amendment claims are brought against state governmental actors.  *See Tharpe v. Warden*, 834 F.3d 1323, 1345 n.6 (11th Cir. 2016) ("[T]he Eighth Amendment's protections against cruel and unusual punishment have been incorporated against the States through the Fourteenth Amendment.").

## I. BACKGROUND[2]

Hunter was assigned to IB dormitory while incarcerated at Riverbend, a prison operated by GEO.  Doc. 83-1 ¶¶ 1-2.  At Riverbend, Hunter was allowed to leave his assigned dormitory for "pill call."  Doc. 92 at 1.  Lieutenant Morris was the shift officer in charge at Riverbend on December 10, 2017.  Doc. 83-1 ¶ 1.  On that day, two inmates housed in IB dormitory—one of whom Hunter alleges to be affiliated with the "Bloods" gang—entered the IA dormitory chow hall.  Doc. 83-1 ¶ 3; 92 at 1.  When a correctional officer refused to allow those two inmates to leave because they were not on the pill call list, a fight ensued between the "Bloods" and the "Muslims" resulting in one of the offending inmates being placed in restraints.  Docs. 30 at 4; 83-1 ¶ 4.

After the initial altercation in IA dormitory, Lieutenant Morris ordered inmates secured in their dormitory units.  Doc. 83-1 ¶ 6.  There is no evidence that prison staff

---

[2] Unless otherwise stated, all facts are undisputed.  Cognizant of Hunter's pro se status, following Defendants' motion for summary judgment, the Court advised Hunter of his duty to respond to a motion for summary judgment, including that he could not rely on the pleadings but instead must present evidence to establish a genuine issue of material fact and must provide his own statement of material facts and respond to Defendants'.  Docs. 86; 90.  Despite this notice, Hunter's response failed to meet these requirements.  *See* Doc. 92-2.  Not only did Hunter not respond to Defendants' asserted facts, but he failed to provide his own statement of material facts that cited to the record.  *Id*.  Rather, Hunter re-stated conclusory arguments from his complaint.  *Id*.  And by and large, Hunter has presented no evidence, outside of his own allegations, to support his claims.  *See id*.  Thus, Hunter has "fail[ed] to properly support an assertion of fact [and] fail[ed] to properly address Defendants' assertion of fact as required by [Fed. R. Civ. P.] 56(c)," and, accordingly, "the court may … consider [those] facts undisputed for purposes of the motion" pursuant to Rule 56(e)(2).  Moreover, pursuant to Local Rule 56, those material facts asserted by Defendants', "which [Hunter has] not specifically controverted by specific citation to particular parts of materials in the record," are deemed to be admitted.  M.D. Ga. L.R. 56 ("All material facts contained in the movant's statement [of material facts] which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate.").  However, the Court has still "review[ed] the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact."  *Reese v. Herbert*, 527 F.3d 1253, 1269 (11th Cir. 2008) (citation and quotation marks omitted).  And despite the deficiencies in Hunter's response, because Hunter is proceeding pro se, and because summary judgment would lead to dismissal of his claims with prejudice, the Court has fully analyzed Hunter's claims for relief regardless of these failings and insufficiencies in his response.  *United States v. 5800 SW 74th Ave.*, 363 F.3d 1099, 1101 (11th Cir. 2004).  Therefore, if evidence in the record shows that a fact is disputed, the Court draws all justifiable inferences in Hunter's favor for purposes of summary judgment.

knew of any threats and "neither [Hunter] nor any other inmate attempted to notify the prison's security staff" of the potential for violence in IB.  Doc. 83-1 ¶ 8.  Nonetheless, a fight did erupt in IB.  Docs. 83-1 ¶ 10; 92 at 2.  Hunter was one of sixteen inmates involved in this altercation, which lasted approximately one minute.  Docs. 83-1 ¶ 11-12; 83-3 ¶ 17.  During the incident, Hunter claims he slipped on condensation on a tiled area, fell, and injured his right knee.  Doc. 92 at 2.

Lieutenant Morris and other prison staff entered IB dormitory approximately two minutes and thirty seconds after the first punch was thrown.[3]  Doc. 83-1 ¶ 13.  Upon their arrival, several inmates were brandishing homemade weapons and refused Lieutenant Morris's verbal instructions to disarm.  *Id.* ¶¶ 13-14.  Because the responding officers were outnumbered and did not carry weapons, Lieutenant Morris ordered them to leave the dormitory and monitor the situation through the windows.[4]  *Id.* ¶¶ 14-16.  With his officers monitoring the inmates, Lieutenant Morris went to the main security office to call the Security Supervisor and request permission to activate the prison's emergency response team.  *Id.* ¶ 16.  Unlike the officers who initially responded, the prison's emergency response team possessed weapons and protective gear.  *Id.* ¶¶ 15-16.

Because of his role in the fight, Hunter was placed in administrative segregation, where Hunter claims he received no medical care until January 4, 2018.  Docs. 83-1 ¶ 18; 92 at 2.  But in his "Declaration in Opposition to Defendants' Motion for Summary

---

[3] Hunter claims that it took forty-five minutes for officers to arrive, but video evidence disputes that.  Doc. 92 at 2; *see also* Docs. 83-1 ¶ 11-12; 83-3 ¶ 5.  Because the fight lasted only a minute, whether officers arrived in two and a half or forty-five minutes is of no consequence.

[4] Specifically, the officers did not carry "OC spray, or other means by which to defend themselves (only certain supervisors carried OC spray, but no other weapon)."  Doc. 83-1 ¶ 15 (citing Doc. 83-3 ¶ 15).

Judgment," Hunter asserts that he was treated at Riverbend Medical Department for his right knee injury: "on 12-10-17, 12-20-17, 1-4-18, 1-9-18 and for therapy sessions … on 12-20-17."  Doc. 92-1 ¶ 4.  The latter version is corroborated by Hunter's own admissions elsewhere in the record that he was seen by a nurse in administrative segregation on December 10, 2017, and that he was seen by a physician assistant on December 20, 2017.  Docs. 92 at 2; 83-3 at 58:1-9.

Hunter's medical records indicate that he was examined on the night of the incident, December 10, 2017; on December 15, 2017; and twice on December 20, 2017—once by Nurse Angela Newman and a second time by a physician assistant.[5]  Doc. 83-1 ¶¶ 20-23.  Hunter was provided medication for his swelling and pain, as well as a right knee brace and crutches.  *Id.* ¶¶ 22-23.  Hunter, however, disputes—without citing any evidence in the record—that he was seen by anyone on December 15, 2017, and further claims never to have seen or been treated by Nurse Angela Newman.  Doc. 92-3 at 3.  But the record reflects that Hunter was seen again by Newman on January 3, 2018, and referred for an x-ray of his right knee.  Doc. 83-1 ¶ 23.  *Id.*  Hunter does not dispute that he was referred for an x-ray or that the x-ray was done.

Defendant Bailey, the Health Services Administrator ("HSA") at Riverbend, received the x-ray order on January 3 and made the appointment the same day.  Docs. 83-1 ¶ 19; 83-5 ¶ 10.  As HSA, Bailey was responsible for oversight of the medical department's administrative tasks and functions, but she did not personally evaluate or

---

[5] According to Defendant Bailey, "[o]n December 15, 2017, Hunter was seen by nurse Charles Coleman, RN … Nurse Coleman prescribed Hunter acetaminophen for his pain complaints and advised Hunter to avoid strenuous activity, take his medication as needed, and return to the medical department if his condition persisted or worsened.  The assessment was reviewed by Dr. Moore on December 18, 2017."  Doc. 83-5 ¶ 7.

treat patients and could not order a specific course of treatment, medication, diagnostic evaluation, or accommodation.  Doc. 83-1 ¶ 19.  Such decisions were exclusively made by the medical providers at the prison, and Bailey was responsible only for "implementing, scheduling, or obtaining the treatment, testing, medication, or accommodations as prescribed by [those] professionals."  *Id.*

On January 9, 2018, Physician Assistant Meresee examined Hunter and reviewed his x-ray.  Doc. 83-1 ¶ 24.  Meresee noted that Hunter's x-ray revealed a minimally displaced, depressed tibial plateau and referred Hunter to be seen by Dr. Moore, an in-house physician at Riverbend.[6]  *Id.*  On January 10, 2018, Moore examined Hunter and referred him to a private orthopedist.  Doc. 83-1 ¶ 24.  Bailey scheduled Hunter to be seen on January 11, 2018, at Oconee Orthopedics, LLC.  Docs. 83-1 ¶ 24; 83-5 ¶ 12.

On that date, additional x-rays revealed a 1mm impacted fracture of the tibia.  Doc. 85 at 25.  Hunter was placed in a knee brace and advised to remain in the brace at full extension for four weeks and to avoid weight-bearing until his follow-up appointment.  *Id.*; Doc. 83-1 ¶ 24.  Oconee Orthopedics recommended Hunter be housed in the infirmary to make that possible, but Hunter signed an acknowledgement "that he refused housing in the infirmary and to be non-weight bearing on his right knee."  Doc. 83-1 ¶ 25.

Hunter received additional treatment at the Riverbend Medical Department on January 12 and 16.  *Id.* ¶ 25.  On February 9, Hunter returned to Oconee Orthopedics and a MRI scan and physical therapy were ordered.  *Id.* ¶ 26.  Bailey scheduled

---

[6] Hunter claims to have seen Physician Assistant Meresee on only one occasion, on December 20, 2017.  Doc. 92-1 at 2.  Nevertheless, Hunter admits he was seen and x-rayed on January 9.  Doc. 92 at 2.

appointments for both orders the same day.  *Id.*  ¶¶ 26-27; 83-5 ¶ 18.  Hunter began his physical therapy on February 16 and had the MRI on February 28.  Docs. 83-1 ¶¶ 26-28; 83-5 ¶¶ 18-19.  On March 1, Bailey scheduled Hunter's follow up appointment at Oconee Orthopedics.  Doc. 83-1 ¶ 27.  Hunter was seen there on March 30.  *Id.* ¶ 28.  Hunter was ordered to continue physical therapy, and he received twenty-one therapy sessions between February 16, 2018, and his release on May 18.[7]  *Id.*  ¶¶ 26, 28.  The day of his release, Hunter was provided a post-release discharge plan and advised to follow up with a primary care provider.  *Id.*  ¶ 28.

Following his discharge, Hunter filed this case and sought leave to proceed *in forma pauperis*.  Docs. 1; 2.  The Court granted that request, in part, and allowed some of Hunter's claim to proceed.  Doc. 4.  With the benefit of several motions to dismiss (Docs. 56; 60), only Hunter's Eighth Amendment claims against GEO, Bailey, and Lieutenant Morris remain.  Those Defendants now move for summary judgment.[8]  Doc. 83.

---

[7] Hunter's underwent physical therapy on February 16, February 23, February 27, March 2, March 6, March 9, March 13, March 16, March 20, March 23, March 27, April 3, April 6, April 10, April 13, April 17, May 1, May 8, May 11, May 15, and May 18, 2018.  Doc. 83-1 ¶ 26.

[8] Hunter's outstanding "Motion to Compel" (Doc. 80) and "Motion to Stay Discovery" (Doc. 88), pending resolution of the former, are without merit.  In short, Hunter's motion takes issue with Defendants' failure to produce alleged video evidence.  Doc. 80.  Previously, however, Hunter moved for sanctions based on the Defendants' late response to discovery requests.  Doc. 71.  After a hearing on that motion, the Court ordered Defendants to file a verified statement describing what efforts had been made to locate videos and what videos were and were not available.  *See* Doc. 75 at 1.  Counsel provided an affidavit that confirmed that the Defendants had provided all available discovery.  Doc. 76-1.  That affidavit included pictures of individual medical treatment rooms; those rooms did not have cameras.  *See generally id*.  The Court also extended discovery by more than three months so that Hunter would have adequate time to review the Defendants' production and to conduct all necessary discovery.  Doc. 75 at 1.  Hunter's current motion merely raises issues that were already addressed in this Court's order denying his motion for sanctions. *See* Doc. 79.  Moreover, several of Hunter's contentions are conclusively disproven by documents in the record, and where that is the case, the facts are considered undisputed.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt

## II.  STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).  "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[ ]' in order to discharge this 'initial responsibility.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (alterations in original) (quoting *Celotex*, 477 U.S. at 324).  Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

---

that version of the facts for purposes of ruling on a motion for summary judgment.").  Accordingly, Hunter's motions (Docs. 80; 88) are **DENIED**.

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324).  The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion.  Fed. R. Civ. P. 56(e)(2).  However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

## III.  DISCUSSION

GEO moves for summary judgment on Hunter's Eighth Amendment claims for failure-to-protect, conditions of confinement,[9] and deliberate indifference to serious medical needs.  Doc. 83.  Lieutenant Morris likewise moves for summary judgment on Hunter's Eighth Amendment failure-to-protect-claim, and Bailey moves for summary judgment on Hunter's claim for deliberate indifference to serious medical needs.  *Id.*

### A.  Hunter's Failure-to-Protect Claims Fail

GEO and Lieutenant Morris are entitled to summary judgment on Hunter's Eighth Amendment failure-to-protect claims.  Although "prison officials have a duty ... to protect

---

[9] Hunter's conditions-of-confinement claim against GEO was only raised in Hunter's response to Defendants' motion for summary judgment.  Doc. 92 at 2.  Nonetheless, Defendants' address the claim in their reply, Doc. 93 at 3-4, and out of an abundance of caution the Court will address that claim here.

prisoners from violence at the hands of other prisoners," not every instance of violence between inmates "translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (alterations in original).  It is only "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate [that] violates the Eighth Amendment." *Id.* at 828.  "Merely negligent failure to protect an inmate from attack does not justify liability under Section 1983." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990).

Rather, to survive summary judgment on an Eighth Amendment failure-to-protect claim an inmate must produce sufficient evidence of: (1) a substantial risk of serious harm; (2) deliberate indifference to that risk; and (3) causation.  *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013).  To establish deliberate indifference in this context, a prisoner must show that prison officials subjectively knew of the substantial risk of serious harm and that the prison officials knowingly or recklessly disregarded that risk.  *Id.* at 1332.

1. *Lieutenant Morris is Entitled to Summary Judgment*

Hunter fails to produce evidence as to each element of his failure-to-protect claim against Lieutenant Morris.  First, Lieutenant Morris was not aware of any specific or general threat of violence against Hunter or any other inmate in IB dormitory following the initial altercation in IA dormitory.  Doc. 83-1 ¶¶ 5, 8.  And even assuming he was, it is unclear how this should have alerted Lieutenant Morris to any risks posed specifically to Hunter, given that Hunter was not a member of either gang.  Doc. 83-4 at 27:11-18.  In other words, Hunter has failed to show Lieutenant Morris "[was] aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed],"

and that Lieutenant Morris actually drew that inference.  *Purcell v. Toombs Cnty.*, 400 F.3d 1313, 1319-20 (11th Cir. 2005) (internal quotation marks omitted).

Second, there is no evidence in the record that Lieutenant Morris failed to respond reasonably to the risks identified by Hunter after the initial altercation on December 10, 2017.  *See Farmer*, 511 U.S. at 845 (explaining that "prison officials who act reasonably cannot be found liable").  To the contrary, the record indicates that Lieutenant Morris did the very thing Hunter claims he should have done: lock down the prison.[10]  Doc. 83-1 ¶ 4.  Moreover, after the subsequent altercation in IB dormitory, Lieutenant Morris further instructed the responding officers to monitor the situation through windows outside the dormitory while he traveled to the main security office to request activation of the prison's emergency response team.  *Id.* ¶ 16.

Hunter claims Lieutenant Morris should have instead ordered the inmates to be confined or "locked down" to their individual beds.  Doc. 92 at 1.  But Hunter fails to proffer any evidence that by failing to do so, Lieutenant Morris acted unreasonably.  In fact, it is undisputed that "[t]here is no prison policy or protocol requiring that all inmates be confined to their individual beds following an inmate altercation."  Doc. 83-1 ¶ 7.  Instead, prison staff "are simply required to use their best judgment to take measures to deescalate tensions and prevent the further spread of disruptive behavior."  *Id.*  As a result, Lieutenant Morris placed the inmate involved in the initial altercation in administrative segregation and ordered the other inmates to be separated and placed in their respective dormitories.  *Id*.  Lieutenant Morris testified that he "did not believe that

---

[10] Hunter disputes "whether defendant Morris knew and failed to lockdown IA and IB dormitory after the fight between bloods and Muslims."  Doc. 92-2 ¶ 8.  But Hunter cites nothing in the record to support this contention.

further measures were necessary at that time," and Hunter has not produced any evidence to the contrary.[11]  Doc. 83-3 ¶ 10.

Nor is there evidence tending to establish Lieutenant Morris caused Hunter's knee injury.  Hunter claims in conclusory fashion that Lieutenant Morris's "failure to lockdown resulted in the bloods attacking Muslims in IB dormitory" and his "fail[ure] to station officers to the dormitories to monitor suspicious activities or monitor the video cameras" caused his injuries.  *Id*.  Lieutenant Morris, however, testified that inmates are in fact monitored by security cameras, and officers are further required to make rounds within the building.  Doc. 83-3 ¶ 3.  And the record establishes that Lieutenant Morris did order inmates to be locked down in their individual dormitories.  *Id.* ¶ 10.  Most significantly, surveillance footage shows that Hunter voluntary joined the altercation which led to his injuries while many other inmates chose to remain uninvolved.  Docs. 83-1 ¶ 9; 83 (Ex. E).

Finally, Hunter's arguments suggest that his failure to protect claim against Lieutenant Morris is really a supervisor liability claim against Morris or some unnamed Riverbend personnel.  That is not the claim Hunter pled, but the Court addresses it nonetheless.

It is well established that supervisory officials are not vicariously liable under § 1983 for the unconstitutional acts of their subordinates.  *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotation marks omitted).  Instead, § 1983 liability

---

[11] In response to Defendants' motion for summary judgment, Hunter submitted two internet articles and a Georgia Department of Corrections ("GDC") press release concerning prison lockdowns.  Docs. 92-14; 92-15; 92-16; 92-17.  However, even if these materials were admissible, they do not dispute the fact that there is no policy to confine inmates to their beds or that tends to establish that Lieutenant Morris otherwise acted improperly.

arises only when either "the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Id*.  The causal connection may be established by showing that: (1) the supervisor had notice of a history of widespread abuse, which he neglected to correct; (2) the supervisor implemented a custom or policy that resulted in deliberate indifference to constitutional rights; or (3) the facts support an "inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* (internal quotation marks omitted).

      This, Hunter has not done.  Although Hunter claims that on the date of the incident, Lieutenant Morris was "in charge of the total operation of the prison," he provides no basis for this conclusory allegation.  Indeed, the fact that Lieutenant Morris was required to channel his request to activate the emergency response team through the Security Supervisor indicates this was not the case.  Docs. 83-1 ¶ 16; 92 at 4.  But even if Lieutenant Morris was in charge, Hunter proffers no evidence of past incidents at Riverbend that led to violence, that Lieutenant Morris was responsible for staffing, or that Lieutenant Morris directed any subordinate to act improperly.

      Because Hunter presents no specific evidence tending to show that Lieutenant Morris acted with deliberate indifference to a known, substantial risk of serious harm to Hunter's safety, Lieutenant Morris's motion as to Hunter's failure-to-protect claim is **GRANTED**.

### 2. GEO is Entitled to Summary Judgment

GEO, as the commercial operator of Riverbend, is the "functional equivalent" of the government entity it serves by virtue of the state function GEO performs. *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997). As such, GEO receives the same protection from vicarious liability or *respondeat superior* claims as a traditional state actor. *Monell v. Dep't of Soc. Servs. of NY*, 436 U.S. 568, 691 (1978). For Hunter's failure-to-protect claim against GEO to survive, he must produce some evidence of: (1) a violation of his constitutional rights; (2) that GEO had a policy or custom that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the constitutional violation. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). Liability may also be imposed in the absence of a policy that establishes appropriate procedures to ensure that a person's constitutional rights are not violated. *See Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991). In those circumstances, a plaintiff must show that the "'policy of inaction' is the functional equivalent of a decision by the [entity] itself to violate the constitution." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 394-95 (1989) (O'Connor, J., concurring).

Here, Hunter essentially contends that GEO's staffing policy and policy of confining inmates to their dormitories were insufficient to safeguard his safety. Doc. 92. But as discussed, Hunter has not provided evidence of widespread violence. *See Purcell*, 400 F.3d at 1320 ("[O]ccasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment, [but] confinement in a prison where violence and terror reign is actionable.") (internal quotation marks omitted). Nor can Hunter point to another occasion when GEO's alleged understaffing or lockdown-policy

contributed to or exacerbated an inmate's medical condition or endangered his safety. While Hunter has proffered material regarding understaffing at Ware State Prison, such evidence is irrelevant to alleged understaffing at Riverbend. Doc. 92-18. Simply put, this isolated incident is not evidence of a "persistent" or "widespread" policy of understaffing Riverbend such that inmate health or safety would be endangered.[12] *See McDowell*, 392 F.3d at 1291. Without such evidence, Hunter's claim fails, and GEO's motion with respect to the failure-to-protect claim is **GRANTED**.

**B. Hunter's Deliberate Indifference to Serious Medical Needs Claims Fail**

Bailey and GEO also move for summary judgment on Hunter's Eighth Amendment deliberate indifference to serious medical needs claims.[13] Doc. 83. "To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). Regarding the objective component, an inmate must prove an objectively serious medical need that, if left unattended, poses a substantial risk of serious harm. *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (internal quotation marks omitted). With respect to the subjective component, to survive summary judgment Hunter must produce evidence of: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere

---

[12] "[Hunter] cannot rely on a generalized policy of understaffing." *See Anderson v. City of Atlanta*, 778 F.2d 678, 687-88 (11th Cir. 1985). Rather, he must show GEO had a "deliberate intent" to inadequately staff Riverbend. *McDowell*, 392 F.3d at 1290-91. Hunter has not done that here.

[13] Deliberately indifferent conduct includes: "(1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all." *Melton v. Abston*, 841 F.3d 1207, 1223 (11th Cir. 2016). "A defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference." *Id.*

negligence.  *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).  Finally, as with any tort claim, Hunter must show that an injury was caused by the prison official's wrongful conduct.  *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).

1. *Bailey is Entitled to Summary Judgment*

Assuming that Hunter had an objectively serious medical need, Hunter still does not satisfy the subjective knowledge element of his claim.[14]  Hunter's claim of inadequate medical care has two aspects.  First, Hunter alleges a delay in receiving medical attention.  Doc. 92 at 6.  Second, Hunter contends that Bailey failed to schedule him for continued treatment following his release from Riverbend.[15]  *Id*.

But the record, including Hunter's own statements, refutes both of Hunter's conclusory allegations.  Hunter was examined on the evening of the altercation; five days later on December 15, 2017; and twice on December 20.  Doc. 83-1 ¶¶ 20-23.  On January 3, 2018, Hunter was seen again, an x-ray was ordered, and Bailey made the appointment the same day.  Doc. 83-5 ¶ 10.  The x-ray was performed on January 9, 2018, and Hunter was referred to a physician, which Bailey scheduled for the next day.  Doc. 83-5 ¶ 11.  Hunter received orders for a MRI scan and physical therapy on

---

[14] "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Youmans v. Gagnon*, 626 F.3d 557, 564 (11th Cir. 2010) (quoting *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009)).  In this case, Hunter was diagnosed with a minimally displaced, depressed tibial plateau on January 9, 2018, and a meniscal tear on February 9, 2018.  Doc. 83-1 ¶¶ 24, 26.  Because this is undisputed, it is not necessary to discuss the internet materials—including Wikipedia images and internet searches regarding his diagnosis—that Hunter submitted in response to Defendants' motion.  Docs. 92-5; 92-6; 92-7; 92-8; 92-9; 92-10; 92-11; 92-12; 92-13.

[15] The Eleventh Circuit has not yet directly addressed the extent, if any, of the obligation to provide inmates with ongoing treatment after being released—although the court has indicated on at least two occasions the approach that it would take.  *See Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1039 (11th Cir. 2001); *see also Johnson v. Florida*, 348 F.3d 1334 (11th Cir. 2003).  Here, however, it is not necessary to address that issue because Hunter has not shown that Bailey acted with deliberate indifference.

February 12, 2018, which Bailey scheduled that same day.  Doc. 83-5 ¶ 18.  On February 16, 2018, Hunter began physical therapy and underwent an MRI on February 28.  Doc. 83-1 ¶ 26.  Bailey scheduled Hunter a follow-up appointment with a private orthopedist on March 1, 2018, which Hunter attended on March 30.  Doc. 83-1 ¶¶ 26-28.  Between February 16, 2018, and his release from Riverbend on May 18, Hunter received twenty-one physical therapy sessions.  Doc. 83-1 ¶ 26.  On the day of his release, Hunter was ultimately provided a post-release discharge plan and advised to follow up with a primary care provider.  Doc. 83-5 ¶ 28.

In short, the only possible claim Hunter could have against Bailey is that she deliberately failed or delayed scheduling his medical treatment as ordered by his medical providers.  However, the undisputed record shows that Bailey promptly scheduled Hunter's appointments after receiving orders to do so.[16]  Insofar as Hunter apparently disagrees with the course of his medical treatment at Riverbend, mere disagreement about the course of one's treatment is "a classic example of a matter for medical judgment" that does not give rise to an actionable claim of deliberate indifference.  *Estelle v. Gamble*, 429 U.S. 97, 107 (1976); *see also Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) ("Although [the prisoner] may have desired different modes of treatment, the care the jail provided did not amount to deliberate indifference." (alteration in original)).

To survive summary judgment, Hunter was required to present specific evidence that the response of Bailey "was poor enough to constitute 'an unnecessary and wanton

---

[16] Without orders from a medical provider Bailey had no ability to schedule Hunter for additional treatment once he was discharged from treatment with Riverbend Medical Department on May 18, 2018.  Doc. 83-5 ¶ 3.

infliction of pain,' and not merely accidental inadequacy, 'negligence in diagnosis or treatment,' or even 'medical malpractice' actionable under state law." *Taylor*, 221 F.3d at 1258 (quoting *Estelle*, 429 U.S. at 105).  Hunter has failed to do that here.[17]  Accordingly, Bailey's motion for summary judgment is **GRANTED**.

  2.  *GEO is Entitled to Summary Judgment*

GEO also moves for summary judgment on Hunter's medical needs claim.  Doc. 83.  As discussed *supra*, GEO cannot be held vicariously liable for the acts of an agent, unless its policies or customs caused the constitutional violation in question.  *Buckner* 116 F.3d at 452.  Thus, Hunter must demonstrate that GEO's policy or failure to maintain a policy amounted to deliberate indifference to its known or obvious consequences, and a conscious decision not to act.  *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 407.  Here, Hunter has pointed to no specific policy or lack thereof with respect to his medical care for which GEO may be held responsible.  As such, Hunter's claim against GEO must fail and GEO's motion is **GRANTED**.

### C.  Hunter's Conditions-of-Confinement "Claim" Fails

In his summary judgment response, Hunter raises for the first time what could only be a condition-of-confinement claim.  Doc. 92.  Hunter says that GEO knew about building defects resulting in condensation on the floor and because the condensation caused him to fall GEO is liable for his knee injury.  *Id.* at 2.  Of course, Hunter's complaint does not allege a condition-of-confinement claim, but the Court nonetheless addresses the issue.

---

[17] Hunter contends that Bailey failed to schedule him for a total knee replacement due to costs despite being ordered by an off-site medical provider.  But Hunter testified that "there was nothing [the Doctor] could do … because he said that I was too young to have [the] procedure."  Doc. 92-3 at 5.  This is confirmed by Hunter's medical records.  Doc. 85 at 68.

It is well-established that even though "the Constitution does not mandate comfortable prisons," a prisoner's claim that the conditions of his confinement constitute cruel and unusual punishment may state a claim for relief under the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981).  To state an unconstitutional condition-of-confinement claim, a prisoner must show that the deprivations he suffers are objectively and sufficiently "serious" or "extreme" to constitute a denial of the "minimal civilized measure of life's necessities." *Thomas v. Bryant*, 614 F.3d 1288, 1304 (11th Cir. 2010); see also *Brooks v. Warden*, 800 F.3d 1295, 1303-04 (11th Cir. 2015).  This standard is only met when the challenged conditions pose "an unreasonable risk of serious damage to [the prisoner's] future health or safety," *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (internal quotation marks omitted), or if society "considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk," *Helling v. McKinney*, 509 U.S. 25, 36 (1993).  The prisoner must also show that prison officials acted with deliberate indifference, *i.e.*, that the officials knew that the challenged conditions posed an excessive risk to the prisoner's health or safety but disregarded them.  *Swain v. Junior*, 958 F.3d 1081, 1088-89 (11th Cir. 2020).

Even if GEO knew about the condensation, as Hunter contends, the failure to address it is at most negligent.  *White v. Kimbrough*, 2013 WL 5436715, at *1 (N.D. Ga. Sept. 27, 2013) (holding conditions resulting in slip-and-fall were result of mere negligence and not actionable in § 1983).  The floor condensation alone cannot pose an extreme or unreasonable risk of harm, as "[s]lippery floors constitute a daily risk faced by members of the public at large." *Harvey v. Plowman*, 2012 WL 6135818, at *3 (N.D.

Fla. Nov. 7, 2012), *report and recommendation adopted*, 2012 WL 6138339 (N.D. Fla. Dec. 11, 2012). Consequently, "[s]lip and fall accidents do not give rise to federal causes of action." *Wynn v. Ankoh*, 2006 WL 2583370, at *2 (M.D. Ga. Sept. 6, 2006); *see also Smith v. Brown*, 2012 WL 5392154, at *2 (N.D. Ga. Sept. 25, 2012), *report and recommendation adopted*, 2012 WL 5392114 (N.D. Ga. Nov. 5, 2012) (same); *Harvey*, 2012 WL 6135818, at *3 (same). Accordingly, GEO's motion as to that claim is **GRANTED**.

### IV.  CONCLUSION

For the reasons noted, Defendants' motion for summary judgment (Doc. 83) is **GRANTED**.

**SO ORDERED**, this 7th day of April, 2022.

S/ Marc T. Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT